May it please the court, Mr. Nelson, I am Jim Tree, representing Mr. Hartmann on his claim for Social Security Disability Benefits. Mr. Hartmann was ages 19 to 23 during the time he was adjudicating his claim before the Social Security Administration. During his young life, he had already had 15 hospitalizations for diabetes. Most of those hospitalizations involved chiatidosis, which is a very life-threatening condition that comes along with severe diabetes, and he was in the intensive care unit on many of those occasions. In his young life, he experienced acute renal failure, diabetic retinopathy, and was on a complex treatment plan involving a sliding scale for his insulin and the necessity to count... Mr. Nelson, I'll give you the problem that I'm having. It is clear that your client has a very serious medical condition. There's no question about that. The ALJ concedes that, finds that. There's just no dispute to that. It also appears to be relatively undisputed that your client is very, very poor at taking care of his medical condition and that the state of medical treatment is such that, with ordinary care, that his diabetes would be quite manageable and that he likely would be able to work. So the only question that's sort of residual in my mind is whether he has any other condition other than diabetes that prevents him from undertaking his own care, his own medical care. And I would like you to address that question and tell me very specifically what doctors address that. Thank you. I will do that, Your Honor. And I think that is the key issue in this case is because there is noncompliance with treatment, but the key issue is whether there's good reasons for the noncompliance. And the other key issue is whether or not the administrative law judge addressed the good reasons given by Mr. Hartman in any type of meaningful way so that this court would have something meaningful to review. So as to the other conditions, the administrative law judge found that he had borderline intellectual functioning and that was a severe impairment. However, the administrative law judge did not discuss whether or not that was a good reason for his failure to comply with treatment. What the medical evidence shows regarding his borderline intellectual functioning was that in 2002 he had an IQ test score and he had a verbal IQ of 69. Well, that's significant because that's a listing level impairment right there, IQ of 69. Did any of the medical doctors who repeatedly refer to his noncompliance suggest that because of his low functioning IQ, what's reflected in the GAF score and the other testing, that he would not be able to take care of himself? They didn't appear to understand his cognitive deficits. If you've got doctors who are actually examining him and they can't tell that he's low functioning intellectual in talking with him about his medical regimen, then how is it that we're supposed to conclude that because he's got a low IQ that he can't do this if none of the doctors who've examined him, and he saw a lot of people, a lot of people who had their hands on this, including some who are not qualified medical specialists who still offered opinions, sort of layman's opinions on his ability to care for himself? Well, the doctors did offer opinions, but they were the mental health doctors that were trained in that. Dr. Thiel, who evaluated him as a clinical psychologist, said that after eight years of being diagnosed with depression that he had a vague understanding of his medications, of his diet, and of his exercise, and that he did not have the ability on his own. Dr. Thiel specifically said that he would remain disabled unless there was some sort of dramatic intervention done that needed to be involved with the doctors, mental health, and his family. Unfortunately, his family had a very chaotic family, and there were mood disorders and psychotic disorders in his family. Dr. Thiel, I'm at the paragraph that you're describing. He concludes his diabetes is highly likely to remain out of control and make sustainable employment unlikely without an effective medical and diabetes self-management intervention. So what does he mean by that? He went on to explain that, that he said that they needed to have a team approach with his physical doctors, his mental health doctors, and his family. He couldn't do it on his own. But to that point, the last thing you said, he couldn't do it on his own. I just want to circle back to Judge Vibey's question. Did any of the professionals say that? Any of the care providers say that he couldn't do it on his own because of his borderline intellectual functioning? Dr. Thiel did. But there are other doctors who didn't say anything about this, who seem to assume that he could manage this. And the ALJ specifically says Dr. Thiel's findings are inconsistent with other evidence in the record. Yeah, but Judge Vibey, the big issue, the big rub there is that we've got all sorts of concrete data. We have IQ test scores. We have wide-range achievement test scores. We know that his reading and writing levels are at the first, second, and third grade levels. We know his math levels is there. We know he can't add 8 plus 5. We have that data. But, Counsel, did anybody ask the question that Judge Vibey's talking about to these other care providers? I mean, did they just not address it because they weren't asked? Or what is the status of that? All the chart notes say is that they asked him if he understood, and he said yes. And if you read the transcript at the hearing, that's his very nature. I mean, this is a kid that was in special education. The records show he was teased when he was in special education for being in special education and because of his appearance. And the doctor says he lived a very solitary life as a student. So he has to be programmed. Do you understand? Yes. But he doesn't. And it's clear from the data that he doesn't understand. It sounds to me like what you're suggesting is that because what they advocated was this interdisciplinary nature, this team approach, that there's a sub rosa there, that the implication is that that support was necessary because of his intellectual functioning. The first is I want to make sure that I'm right about that, and the second is I'd like to know what is the strongest support for that interpretation of the record. So I think that that comes from Mr. Wolpert, who was a treating therapist. Wolpert. Wolpert, Stephen Wolpert. And it comes from Dr. Thiel, who was an examining psychologist. Okay. Those are going to be the two from that stage. Dr. Thiel noted that he can't count carbohydrates. That's essential to his treatment. And one of the main reasons why the ALJ found he was noncompliant, because he couldn't count carbohydrates, so he couldn't take his medication correctly, and because he couldn't follow his diet correctly. At the hearing, was this issue raised with the ALJ? The issue of the? The excuse for noncompliance, mental impairment. It was raised with the evidence that was submitted, and it was admitted into the evidence at the hearing. But orally was it raised? Not in any kind of good detail, and I think there's a good reason for that, is because the judge. He wasn't represented at the hearing, was he? He was represented at the hearing. He was represented. He was the advocate. Were you there? No. It was a new advocate, a new attorney, Mr. Hatfield. But a big rub that we have with the case is Social Security ruling 8259 says you have to give advance notice if the Social Security Administration is going to raise the issue, and they didn't give advance notice. The way it was handled here under Molina doesn't seem to apply, the notice requirement. They relied on this noncompliance. The ALJ relied on noncompliance in connection with the credibility determination. They use it as a basis for discrediting his testimony. And Molina says that if there's good reasons for the noncompliance, that doesn't mean they're not credible. It means they are credible. It's the same thing. So what you're suggesting is that the ALJ on this record should have realized that he had to explore a little bit deeper the intellectual deficiencies and how that impacted his ability to comply with his diabetes regimen. Yeah. The real big rub that I have is that the judge found that he had borderline intellectual functioning, and she had the evidence from Dr. Thiel and Mr. Wolpert that he couldn't comprehend this, but she didn't say anything about it in her decision. But there is some evidence in the record that with his girlfriend helping him, he's able to manage his treatment. Yeah, except that even at the time that his girlfriend was helping him, the record shows that during that period of time that, for example, at 347 and 493 of the record shows he's gone to diabetic classes, he's exercising more, following a good diet, but his A1C was 14. That's a three-month average. That's dangerous. That's off the scales. That's terrible. And at 773 it says he's compliant with his medications, his girlfriend's helping him, but his blood sugars have been greater than 600 three straight days. There's also evidence in the record that I forget which doctor this is. I can't remember. I can never keep all this straight. But really the problem was a lack of motivation. A big problem was a lack of motivation. A lack of motivation, not the complexities, but just a lack of motivation. Dr. Gupta, I think, that he says that pretty clearly, right? Who? Dr. Gupta. Oh, Dr. Gupta, I only saw him one time. To Judge Pius's point, there's a medical opinion in the record that says that, the problem is lack of motivation as opposed to inability. Okay, lack of motivation, yes. Inability, no, because the judge found that he had a severe mood disorder. And the medical records show, now Dr. Gupta didn't know that, and Dr. Gupta didn't have any of those records for her one-time exam, but the records clearly show that he had a major depressive disorder, that he was raised in a family where there was mood and psychotic disorders, that there was harmful behaviors going on as far as self-harm behaviors, that he was physically abused, that he was teased for being in special education. He developed major depressive disorder. And Dr. Thiel and his treating therapist, Mr. Wolpert, all noted that because of that, that he had a severe inability to take care of himself because of his mood disorder. And when he had his depression, that he became inconsistent with his abilities to take care of himself, including his diabetes control. So not only do we have the borderline intellectual functioning, but we have another severe impairment, a mood disorder, that the ALJ herself found was severe, but again she didn't address whether or not that was a good reason or not. For failure to comply. A good reason for failure to comply. Right, right, exactly. The ALJ didn't even mention it, but there's all sorts of evidence. For example, Dr. Thiel, page 795 in the transcript, says he's unable to set realistic goals. His judgment regarding healthy choices is poor. He only has a vague knowledge about nutrition, medication, exercise. That's after he'd had diabetes for eight years and been hospitalized 15 times. And on a scale of none, mild, moderate, marked, or severe, Dr. Thiel said he was at the severe level in his ability to care for himself. Because of his mental health impairments. Dr. Gupta didn't know that. Could you give me that record site? Yes, it is 798. It is the one on the severe ability to care for himself. Thank you. Did you want to save some time for a rebuttal? Yes, I would. Okay. Thank you, Your Honors. We'll hear from the government. Thank you. Lars Nelson, on behalf of the Commissioner of Social Security. This Court should affirm the decision of the ALJ in this manner because the ALJ's decision is supported by substantial evidence. First and foremost, even assuming that plaintiff's counsel is correct and that there was borderline intellectual functioning and a mood disorder that impacted treatment, the treating doctors, the doctors who were treating Mr. Hartman's diabetes, said that he should seek education. They repeated it over and over again. On October 6th? Yes, but were any of them asked the question that we've been asking? Were any of them asked the question about whether or not his borderline intellectual functioning was part of the problem? No, none were asked whether his intellectual functioning precluded him from it. But I think they were aware that there was a knowledge gap, certainly, between what he was doing and his care because they were looking at a young man who was, at certain points in the record, had severe symptoms and wasn't treating them. And they told him repeatedly to seek the counsel of a dietician and a diabetic educator. And it wasn't until two months before the hearing that he finally did that with any earnest effort, and he testifies at pages 50 and 51 that those classes help him with his symptoms. And his blood sugars are now down consistently to 200. This is his testimony at the hearing. So even assuming that there was borderline intellectual functioning and diabetes that impacted his ability, the evidence shows that the treating doctors knew that repeated education and those sorts of resources was the bridge to help him cross into better care. Counsel, you said even assuming a couple of times. I just want to circle back to that. Are you contesting that his intellectual functioning would have impacted his ability to manage this condition? We are because the ALJ found Dr. Thiel, found Ms. Wolpert. I'm Mr. Wolpert, the counselor. The ALJ rejected those medical opinions, and that's unchallenged. At 823 of the district court's decision, even the district court acknowledges there's no challenge to Dr. Thiel's opinion in this record. It wasn't raised at the district court. So that effectively is off the table. The ALJ considered those opinions, considered any consequence that might come from those opinions, and rejected them. Does the ALJ have any sort of his own obligation to consider? I mean, there is evidence. I don't think he'd dispute this, but that he did suffer from his intellectual ability is not great, right? It's documented in the record. The ALJ even used that as one of the impairments, if I'm not mistaken. And particularly given that we're talking about his ability to follow directions, his verbal score was 69 on his IQ. I believe that is his first one. I don't recall what his second one was, but I believe that his first one in ICU. It's very stark. Yes, no question, Your Honor. All right, so what about that? Why isn't there a duty to inquire to figure out if that isn't part of the problem? Why isn't there a duty to inquire about? Isn't that why this interdisciplinary team approach is needed in this case? Because as you said, he'd had really serious problems controlling this diabetes for over a very protracted period of time. Well, yes, and my answer to that is twofold. First, the ALJ did consider it because he considered the medical opinions in which those sorts of the effects of his mental impairments are discussed. Which opinions? Dr. Thiel's. I thought you said he rejected Dr. Thiel's. He did reject them, but he considered them, and that is all that's required for the ALJ. I mean, the grounds on which he rejects Dr. Thiel, I have to say, didn't move me very much. Well, fortunately, they don't have to, Your Honor, because they weren't challenged on appeal and they weren't challenged at the district court. It's been waived, so we don't get to read Dr. Thiel? No, Your Honor. Well, but you just said the ALJ considered Dr. Thiel. The ALJ did. So we should look to see how he considered Dr. Thiel, right? Well, the ALJ considered it and rejected it, and that issue is now. He rejected it at a very high level of abstraction, which creates a problem for me, because he doesn't reject Dr. Thiel entirely. He says they're only given limited weight. So, you know, immediately, I'm not sure how much weight, limited weight is, but it's obviously some weight as opposed to no weight. And then he just says they're generally without substantial support from other evidence in the record, which obviously renders them less persuasive. That's at such a high level of generality, I have no idea what the ALJ is referring to. I believe, Your Honor, the ALJ also referred to the reports of his daily activities. And that's the big thing that the ALJ comes back to, and the ALJ comes back to that again and again and again. Hartman is caring for his girlfriend's children. He goes on a bicycle ride. He promises the kids he'll take them camping and that those activities are sufficient. He mows the lawn twice a month and so on. But I don't see that any of those reports are inconsistent with other things in the record that document that he has these episodes, you know, once a week. I mean, you can be caring for young kids, go on bicycle rides, promise them that you'll take them fishing or whatever, and still have a medical episode once a week that would render you incapable of working. So I don't know what to do with that because the ALJ hasn't parsed it at that level. Well, the first factor to that, Your Honor, is that the ALJ was aided here by Dr. Gupta, who considered Mr. Hartman's description of his daily activities. And the quote is, he is able to function based on further questioning normally. And that was in spite of uncontrolled diabetes. Dr. Gupta was a one-time examination, right? Yes. And did Dr. Gupta, Judge Bybee just got right to my question, I think Dr. Gupta saw this person one time and opposing counsel made the representation, just want to know if you agree with it, that Dr. Gupta did not have these other tests that indicated the severe borderline intellectual functioning. Not to my knowledge, no. So it's not your contention that he was able to function normally with a verbal IQ of 69. That's not what you're arguing, is it? Well, functioning in accordance with the residual functional capacity assessment. Well, functioning, if Dr. Gupta, we don't know much about what Dr. Gupta meant either, but to say function normally as in I can move around the house, I can do the dishes, I can mow the lawn twice a month, I can watch my girlfriend's kids, that's one thing. Quite another to me, I think, for me to read into that, that this individual could understand and comply with a diabetes treatment regime. Certainly, Your Honor, and I would like to get to that. That's the second point. So there is the specter that perhaps borderline intellectual functioning and a mood disorder impacted his ability to care for himself. Right. That's lurking out there. Well, it's not to care for himself. It's to adhere to the regimen for controlling his diabetes. Yes. Yes, that's exactly the point. The reason for his noncompliance was these mental problems. Now, that is most concretely found in Dr. Thiel's opinion, which is rejected, and Dr. Thiel saw Mr. Hartman.  But not completely. It's given some weight. Less weight than Dr. Gupta, who, like Dr. Thiel, only saw him one time, but saw him with the purposes for treating him in contrast to Dr. Thiel. Instead of relying on this supposition that these mental impairments may have caused difficulty, the ALJ relied on concrete evidence that it was not for these mental impairments that were causing his problems. It was specifically that he lacked motivation. The ALJ relied particularly on Dr. Bethlemy's February 2010 report where he says, I have significant concern regarding this patient's history of noncompliance and request for public assistance. And we go back to Dr. Treese's report from October 2008. Wait, before you go to the next report, what's concrete about I have specific concerns? Yes, he has concerns because there's a history of noncompliance, and that's linked in Dr. Bethlemy's mind with the request for public assistance. Okay, but counsel, it doesn't tell me that he thinks that motivation is a problem. Well, the ALJ was looking for what is the reason for noncompliance. Okay, so that's your first concrete example. That's the first. What's your second example, please? We go to Dr. Treese's report from October 2008, 768 in the record, saying the claimant is seemingly content to be on Medicaid. We can then go to January 2008. Eric Stroud, physician's assistant, knows he is not compliant, but he is nevertheless asking me to sign public assistance forms indicating compliance. And the ALJ could reasonably look at these records and say that the lack of compliance was motivated by something other than a mental health impairment. Well, it seems like if a condition of staying on public assistance, whatever it was, general relief or whatever he was getting, required him to comply, you would think that he would comply, right? Yes, Your Honor, you would. And, you know, in preparation for this oral argument, I looked up the phrase, you can lead a horse to water, but you cannot make him drink. And that's actually the oldest phrase in the English language that is still used today, and it's not because we ride horses to the courthouse. It's because sometimes people do things that aren't in their best interest. And I think that's, while it's hard to understand, it was the case here. I'm not sure it's hard to understand if there's a verbal IQ score of 69, counsel, and I just want to give you one more chance to tell me what I'm missing. Well, the ALJ certainly considered that, but his IQ did not prevent him from watching the children, from taking care of activities at home, and the ALJ. You're correct that there was evidence of that, but the regimen that he had to follow, when I read the program or the agenda that they prescribed for him, it's complicated. It is complicated, Your Honor, and absolutely. I have no idea what it's like to be on insulin treatment or diabetes 1 treatment, but it's complicated. But these endocrinologists and these treating doctors see people from all walks of life, and they didn't say at any point that their concern here was that he lacked the capacity to understand their instructions. Rather, they said he should go seek the educational resources available, and Mr. Hartman testified that when he finally did, after his doctors were harping on him again and again to do that, that lo and behold, it helped his symptoms, and his blood sugars were down in the 200 level, which is still uncontrolled. But as Dr. Gupta said, they still show that he can function, and they're certainly far below the 400, 600, and 1,000 levels that they were when he was hospitalized. And unless the Court has any further questions, I'll end that. A few minutes for rebuttal. Thank you, Your Honor. I did want to point out that the credibility argument that the judge gave was threefold, primarily that Mr. Hartman was not following prescribed treatment, second, that his activities of daily living were inconsistent with his claims of disability, and third, that he had a poor work history prior to his alleged onset date. Regarding his poor work history, he was 19 at his alleged onset date and still in high school, so he wouldn't have had a chance. He had held how many jobs? He had tried how many different jobs? He tried at least three jobs, two of which he was fired from for missing work because of his diabetes. The other one, he was aggravating his diabetes, and it became more out of control, and he had to quit because of that. The fact that he keeps trying to get employed, to me, is consistent with not a lack of motivation, quite the contrary. But what about the two other grounds that were cited for, because he only needs one, cited as support for the adverse credibility determination? So activities of daily living, I think, clearly doesn't show that he can work because his activities at home were allowed. He was allowed to rest, take breaks when he was having a high blood sugar, or he often had low blood sugars where he would become very fatigued. And his girlfriend, who the ALJ said that she accepted the girlfriend's opinion, the girlfriend said that when he had these episodes, he would be out of it for a whole day. He would be laying down. Isn't that inconsistent, though, his testimony that when he had these problems, he would be down for a day, he'd be nauseous and vomiting and whatnot and be out of action in bed, is what he said, for a whole day. But he also testified that he, in the summer months, took care of his girlfriend's children full time. Except that what we learn in the transcript is that his girlfriend worked in the home, taking care of her mother. Mr. Hartman, his girlfriend, the kids all lived with his girlfriend's mother. Her job was the caregiver to her mother in the home with the kids, with Mr. Hartman. And I'll find that in the transcript. Yes, that's in the testimony of Mr. Hartman at the hearing. All right, thank you. Yes. And so that's a pretty significant event to me because she was there with the kids the whole time that Mr. Hartman was there, and so when he could, he would help her out. And there was one other one that the district court rejected, another ground. Well, they rejected the grounds of his prior work history didn't make him not credible because he was in high school at that time, and that's not a ground for finding him not credible. The other one was, the third one was his compliance with treatment. Which we've discussed. Which we've talked a lot about. I did want to point out to Your Honor because in my brief I had listed all, there was three different IQ tests that we're giving. And in my oral argument I mentioned the one score of the verbal of 69. In the other two tests that he was given, his verbal IQ was 73 and 76. And that's why we didn't argue that he met a listing because if it was 69, he would have met the listing, but the other two were 73 and 76. Very poor scores and low and didn't change Dr. Teel's because Dr. Teel had all three of those scores when he gave his opinions. Thank you. Okay. Thank you very much, counsel. We appreciate your arguments today, and the matter is submitted.
judges: Paez, Bybee, Christen